OPINION
{¶ 1} Defendant-appellant, John Clyde Callender, Jr., appeals from a Carroll County Common Pleas Court, Domestic Relations Division decision granting a divorce to appellant and plaintiff-appellee, Lavonne Callender.
 {¶ 2} The parties were married on June 24, 1995. They have two children, Tiffani Renee (d.o.b. 12/12/89) and Ciara Raye (d.o.b. 5/21/98). Tiffani is appellee's child from a previous marriage, whom appellant adopted. Appellee filed a complaint for divorce on September 6, 2002. The court ordered that appellee retain temporary custody of the children and set the case for trial. The case proceeded to trial on January 31, 2003 and March 11, 2003. The parties stipulated to some issues while the court tried others. The court entered its judgment and decree of divorce on June 25, 2003.
 {¶ 3} As per the parties' agreement, the court named appellee as the children's residential parent and granted appellant standard visitation. Due to appellee's concerns regarding certain people being present at appellant's parents' house in Pennsylvania, the court ordered that appellant not bring the children to his parents' house more than once every six weeks and that the girls not come in contact with certain people while visiting. The court also valued and divided the marital property, which included nine horses and a horse trailer. The court accepted the values placed on the horses and trailer by Peter Kiko, a realtor/auctioneer, who appraised the parties' property. Additionally, the court found that appellant committed financial misconduct during the marriage. It based this decision in part on the fact that appellant contributed less than 50 percent of his income to the family expenses. Accordingly, the court awarded appellee a greater percentage of the marital property.
 {¶ 4} Appellant filed his timely notice of appeal on July 21, 2003. Upon appellant's motion, the trial court issued a stay of its order pending this appeal prohibiting the sale or transfer of any property subject to the court's property division.
 {¶ 5} Appellant raises four assignments of error. His first and fourth assignments of error are similar and will be addressed together. They state, respectively:
 {¶ 6} "The trial court erred in accepting the facially inadequate Appraisal/Evaluation for accomplished horses which were owned by the parties, which were marital property, and which were awarded to the plaintiff/appellee."
 {¶ 7} "The trial court erred by accepting the appraised value of $2,000 for a Twenty Year Old Horse Trailer which appellee purchased for $8,000 in the year 2001, when there was neither evidence of damage to the trailer nor other evidence to suggest that its value had diminished subsequent to its purchase."
 {¶ 8} Appellant alleges the court abused its discretion by adopting the values of the parties' horses and a 1982 horse trailer set out by the appraiser. He argues that a trial court is not bound by the appraisal or valuation methodology used by an appraiser. Citing, Goswami v. Goswami, 152 Ohio App.3d 151,2003-Ohio-803. Appellant claims that the appraiser was cursory in his inspection of the horses and showed no interest in knowing whether they were accomplished animals. He also claims that the horses' valuations by the appraiser were significantly less than what the parties paid for them, with there being no evidence that the horses had decreased in value due to age or injury. Appellant urges that had the trial court considered his exhibits 2 through 12 (the horses' titles, which he claims demonstrate the exceptional nature of the horses), it would have reached a more reasonable value for the horses. Furthermore, he contends the trailer was purchased in 2001 for $8,000. He asserts the appraisal was unreasonable because it valued the trailer at $2,000, just months after the parties purchased it.
 {¶ 9} In a divorce proceeding, the court is not bound by the appraisal or valuation methodology used by an expert. Goswami, 152 Ohio App.3d at ¶ 19. But a trial court's valuation of marital assets will not be reversed absent an abuse of discretion. Id. Abuse of discretion connotes more than an error of law or judgment; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 10} While a court is not bound to accept an appraisal or valuation by an appraiser, it is certainly within the court's discretion to do so. The court deemed nine horses as marital property. It accepted six horses' values as set out in the Kiko appraisal. These horses were valued at either $800 or $1,200 each. (Plaintiff's Exh. I). The remaining three horses were not evaluated by Kiko. For these horses, the trial court accepted the values as opined by appellee, which ranged from $250 to $800 each. The total value for the nine horses was $7,950.
 {¶ 11} Appellee testified regarding her opinion of the accuracy of the Kiko appraisal. She stated that she believed the appraisal values were accurate due to the way the horse market was at the time. (March Tr. 20-30). Appellee admitted that she paid more for most of the horses than what the Kiko appraisal valued them at. (March Tr. 21-29). She stated that she purchased the horses for between $1,300 and $3,500 each. (March Tr. 21-30). Additionally, appellee admitted that she did not provide Kiko with the horses' titles. (March Tr. 29). She stated that she told Kiko that the horses were registered but that he did not ask for the titles. (March Tr. 30).
 {¶ 12} Appellant testified that Kiko could not have made an accurate evaluation of the horses without their titles because Kiko would not have known their blood lines and accomplishments. (March Tr. 121). He testified that the horses were worth "a lot more" than what they were appraised at. (March Tr. 121-22). However, he gave no specific values.
 {¶ 13} As to the horse trailer, the Kiko appraisal valued it at $2,000 and the court accepted this value. (Plaintiff's Exh. I). Appellee testified that she paid $8,000 for it one to two years ago. (March Tr. 15-16). But she also testified that she agreed with the appraisal value of $2,000. On the other hand, appellant testified that he thought the trailer was worth $7,000. (March Tr. 122).
 {¶ 14} Given the parties' testimony and the Kiko appraisal, we cannot conclude the trial court abused its discretion in accepting the appraised value of the horses or trailer. As to the horses, appellant did not offer an opinion as to what he thought they were worth. The court was left to consider the appraisal and appellee's opinion. As to the trailer, the court was able to consider appellant's opinion, appellee's opinion, and the appraisal. The court must have found that appellant's opinion of the trailer's value was less accurate than appellee's opinion and the appraisal. Additionally, appellant never called Kiko to testify. Appellant was aware of the appraisal before trial. If he believed the values placed on the horses and trailer were off by so much, he should have called Kiko as a witness to determine how he arrived at the values he did. In addition, he could have attained his own appraisal.
 {¶ 15} Accordingly, the trial court did not act unreasonably, arbitrarily, or unconscionably in valuing the horses and trailer. Therefore, appellant's first and fourth assignments of error are without merit.
 {¶ 16} Appellant's second assignment of error states:
 {¶ 17} "The trial court erred by finding financial misconduct of the defendant/appellant based upon his inability to explain where all of his marital income had gone, when the evidence was undisputed that the plaintiff/appellee had control of all marital income and directed the manner in which the defendant/appellant's paychecks were either cashed, deposited, or disposed of by a combination thereof."
 {¶ 18} Appellant contends the trial court erred in finding that he committed financial misconduct, based only upon the court's view that he did not adequately contribute to the family's financial well being during the marriage. He asserts that the evidence revealed that appellee had complete control over the parties' finances and directed him to deposit all or a portion of his paycheck into the family checking account. Therefore, appellant claims, he did not even have control over the money.
 {¶ 19} An appellate court will not disturb a trial court's finding of financial misconduct absent an abuse of discretion.Rice v. Rice (Nov. 8, 2001), 8th Dist. No. 78682, citingBerish v. Berish (1982), 69 Ohio St.2d 318, 319.
 {¶ 20} A spouse may not dissipate assets of the marriage. "If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property." R.C. 3105.171(E)(3). The burden of proving financial misconduct for purposes of R.C. 3105.171(E)(3) is on the complaining spouse. Jacobs v. Jacobs, 4th Dist. No. 02CA2846, 2003-Ohio-3466, at ¶ 25. "Financial misconduct implies some type of wrongdoing in that the offending spouse will either profit from the misconduct or intentionally defeat the other spouse's distribution of marital assets." Wideman v. Wideman, 6th Dist. No. WD-02-030, 2003-Ohio-1858, at ¶ 34. Often times, courts will look to the timeframe during which the alleged misconduct occurred because the use of marital funds or assets during the pendency of or immediately before filing for divorce may demonstrate wrongful scienter. Detlef v. Detlef (Dec. 14, 2001), 6th Dist. No. L-00-1137. See, also, Babka v. Babka
(1992), 83 Ohio App.3d 428; Gray v. Gray (Dec. 8, 1994), 8th Dist. No. 66565.
 {¶ 21} The trial court found that for the first two years of their marriage, appellant was unemployed and appellee was the primary provider of financial support for the family. It noted that while appellant testified that he was the primary caregiver, at the time, the parties only had one daughter and she was already school age. The court further found that appellant gained employment in 1998. He then grossed approximately $26,500 per year while appellee grossed approximately $37,100 annually. (Plaintiff's Exh. A, B, C, J). The court noted that during the marriage, appellee handled all of the family's finances and paid the bills. The parties had one checking account from which the bills were paid and into which appellee's wages were directly deposited. The court found that appellant only contributed $5,400 in 1998, $4,900 in 1999, $2,400 in 2000, $3,500 in 2001, and $5,700 in 2002 to household expenses. (Plaintiff's Exh. K, L, M, N, O). The court noted that appellant's deposits/contributions were substantially less than half of his available income for those years.
 {¶ 22} The court found that while at some point, appellant made truck payments and had a Pennsylvania child support obligation to pay (in an unknown amount), his contributions of only $21,900 over five years was "certainly suspect if not pathetic." The court concluded that this "irresponsible behavior in not supporting one's spouse and two (2) minor children to the fullest extent possible should not be rewarded," and amounted to financial misconduct. Thus, the court determined that appellee was entitled to some compensation for appellant's mismanagement. In dividing the martial property, the court applied its finding of financial misconduct and awarded appellee her 403(B) retirement account of $6,141.87 in full.
 {¶ 23} In Hammond v. Brown (Sept. 14, 1995), 8th Dist. No. 67268, the court faced a similar scenario. In Hammond, the wife contended that the husband committed financial misconduct because (1) the parties saw no rise in their standard of living, despite seeing their combined incomes more than double in less than four years and (2) the husband could not account for approximately $10,000 withdrawn from his personal checking account in a one year period, other than to say he spent the money on ordinary living expenses. The court noted that the wife did not allege the misconduct occurred at a time that would create a presumption in her favor. Additionally, the court observed that there were no allegations that the husband personally profited from his actions or engaged in misconduct solely to defeat the wife's interest in the marital estate. The court concluded that it was not error for the trial court to conclude that no financial misconduct took place when the evidence showed, "the husband spends money more freely than the wife."
 {¶ 24} Likewise, in this matter, there are no allegations that appellant personally profited from his actions or engaged in misconduct in order to defeat appellee's distribution of marital assets. Furthermore, the timeframe during which appellant's alleged misconduct occurred was during the entire marriage, not simply the time prior to the divorce. Thus, appellee was not entitled to a presumption that appellant committed misconduct. And while appellant is obviously a spendthrift, this alone does not amount to financial misconduct.
 {¶ 25} Appellant testified that he did not know a lot about the family finances, but that appellee did. (Jan. Tr. 23). Appellee testified that appellant kept what he wanted from his paycheck and deposited the rest into the family checking account. (Jan. Tr. 80). She stated that she did not know where the money that appellant kept out of the checking account went. (Jan. Tr. 85). The court recognized that appellant paid a truck payment and a child support obligation. While we are not sure how much these payments were, there is some indication in the parties' bank records that appellant may have paid $111 for child support and $386 for his truck payment. (Plaintiff's Exh. K). Whether appellant paid child support biweekly or monthly is unclear. These two expenditures certainly account for a sizeable portion of appellant's spending.
 {¶ 26} Given the above information, the trial court acted unreasonably in finding that appellant engaged in financial misconduct. The burden rested with appellee to prove that appellant either profited from his actions or interfered with appellee's property rights. No such evidence exists. Accordingly, appellant's second assignment of error has merit.
 {¶ 27} Appellant's third assignment of error states:
 {¶ 28} "The trial court limitation on the travel by the defendant/appellant with his children during visitation to visit the paternal grandparents in pennsylvania is unreasonable and not in the best interests of the children, as the allowance of some visitation to pennsylvania suggests that such visitation is not in itself harmful to the children, and there was no justification given by the trial court that more frequent visitation to pennsylvania would not be in the best interests of the children."
 {¶ 29} Appellant's parents live in Chicora, Pennsylvania. Their house is divided into a two-family dwelling with the first floor completely separated from the second floor. Appellant's parents live on the first floor. Appellant's ex-girlfriend, Katherine Popp, and her and appellant's two children, 13-year-old Jesse and his younger brother Jason, occupy the second floor. Jesse and Jason are Tiffani's and Ciara's half-brothers.
 {¶ 30} Appellant asserts that the trial court abused its discretion in placing limits on how often the children could visit at their grandparents' house. He claims that the children's best interests dictate that they be permitted to visit with their grandparents and brothers in Pennsylvania. Appellant asserts that had the trial court believed the visits were harmful to the children, it would have forbidden them all together. But since it only restricted the frequency of the visits, with no finding that the visits would be harmful to the children, the court acted unreasonably.
 {¶ 31} When reviewing matters concerning visitation rights, appellate courts must apply an abuse of discretion standard of review. Booth v. Booth (1989), 44 Ohio St.3d 142, 144. A trial court may limit or restrict visiting rights of a party in order to further the child's best interest. Anderson v. Anderson,147 Ohio App.3d 513, 2002-Ohio-1156, ¶ 18. "`This includes the power to restrict the time and place of visitation, to determine the conditions under which visitation will take place and to deny visitation rights altogether if visitation would not be in the best interests of the child.'" Id., quoting Jannetti v. Nichol
(May 12, 2000), 7th Dist. No. 97 CA 239.
 {¶ 32} R.C. 3109.051 governs visitation rights of nonresidential parents: "If a divorce * * * proceeding involves a child and if the court has not issued a shared parenting decree, the court * * * shall make a just and reasonable order or decree permitting each parent who is not the residential parent to have parenting time with the child at the time and under the conditions that the court directs, unless the court determines that it would not be in the best interest of the child to permit that parent to have parenting time with the child and includes in the journal its findings of fact and conclusions of law." R.C.3109.051(A).
 {¶ 33} The trial court placed three different restrictions on appellant's visitation with his daughters: (1) he cannot bring the girls to his parents' home in Pennsylvania more than once every six weeks; (2) the girls must have no contact, physical or otherwise, with Ms. Popp; and (3) the girls must have no contact, physical or otherwise, with Ms. Popp's children, the girls' half-brothers. These restrictions will be addressed out of order.
 {¶ 34} While there is not overwhelming evidence regarding Ms. Popp, sufficient evidence exists on the record to warrant the court's restriction that the girls not have contact with her. Appellee testified that when Ms. Popp has been around Tiffani, she has been verbally abusive towards her. (Jan. Tr. 64-65). She also testified that Ms. Popp has tried to manipulate four-year-old Ciara. (Jan. Tr. 65). Furthermore, appellant and appellee both testified that during the marriage, they did not allow the girls to be around Ms. Popp. (Jan. Tr. 41, 66). Appellant additionally testified that he did not want them to be around Ms. Popp. (Jan. Tr. 42). The parties both agreed that Ms. Popp was not an appropriate person to be around the girls. Given this fact, the trial court acted within its discretion in placing this restriction on appellant's visitation.
 {¶ 35} But the record does not support the trial court's other restrictions. The evidence regarding Tiffani's and Ciara's contact with their half-brothers was as follows. When asked if he was aware of problems between Tiffani and his son, Jesse, appellant responded "no." (Jan. Tr. 40). He stated, "[t]hey have spats, but all kids have spats." (Jan. Tr. 40). Appellant stated that when they lived in Pennsylvania, he had visitation with Jesse and Jason every other weekend and brought them to his house. (Jan. Tr. 41). He testified that he wanted the girls to spend time with Jesse because he is their brother. (Jan. Tr. 42). Appellee testified that she was concerned with how Jesse treats Tiffani. (Jan. Tr. 66). She stated that he has cussed at Tiffani and told her to "shut the `F' up" and that she did not want her children to hear that kind of language. (Jan. Tr. 66). She also stated that Jesse and Tiffani have gotten into arguments where he punched her. (Jan. Tr. 66). This was the extent of the testimony regarding the children's relationship with each other.
 {¶ 36} This evidence does not support the court's restriction that appellant not allow his daughters to have any contact with their half-brothers. The testimony indicates the problems are mostly with the boys' mother, not with the boys themselves. While appellee did testify that Jesse fights with Tiffani and swears at her, this behavior is not so atrocious as to ban all contact between half-siblings. Tiffani and Jesse are less than a year apart in age. They are bound to fight with each other, and while the language Jesse may use is inappropriate, it does not warrant an outright bar on contact with his half-sister. Supervision could occur to monitor the situation.
 {¶ 37} Additionally, the record does not support the court's restriction that appellant not bring the girls to their grandparents' home. It seems this restriction is meant to limit the chances that the girls will come into contact with Ms. Popp or the boys. Appellee testified that she has no problem with the girls spending time with their grandparents. (Jan. Tr. 67). She stated that her problem was with the fact that Ms. Popp lived upstairs from appellant's parents. (Jan. Tr. 67). If the court believed that spending time at their grandparents' home was detrimental to the girls, it should have placed a ban on all visits to the grandparents' home. However, the record does not support that type of ban. And so it follows that the record does not support the court's limitation on the number of times the girls can visit at their grandparents' home.
 {¶ 38} Therefore, while the restriction prohibiting contact with Ms. Popp is supported by the record, the other restrictions are not. Accordingly, appellant's third assignment of error has merit.
 {¶ 39} For the reasons stated above, the trial court's decision is hereby affirmed as to appellant's first and fourth assignments of error, and reversed and remanded for further proceedings according to law and consistent with this opinion as to appellant's second and third assignments of error.
Waite, P.J., and DeGenaro, J., concur.